# In the United States Court of Federal Claims

No. 21-2340 C
Filed Under Seal: June 21, 2022
Reissued: June 29, 2022[*]

```
* * * * * * * * * * * * * * *** *
                                *
ACI TECHNOLOGIES, INC.,         *
                                *
                   Plaintiff,   *
                                *
       v.                       *
                                *
THE UNITED STATES,              *
                                *
                   Defendant,   *
                                *
and                             *
                                *
THE PENNSYLVANIA STATE          *
UNIVERSITY,                     *
                                *
            Defendant-Intervenor. *
                                *
                                *
* * * * * * * * * * * * * * *** *
```

*Todd M. Garland*, argued the motion, *Jonathan D. Shaffer*, counsel of record, Smith Pachter McWhorter PLC, of Tysons Corner, VA, for Plaintiff.

*Jimmy S. McBirney*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Eric P. Bruskin*, Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Principal Deputy Attorney General, all of Washington, D.C., for Defendant, and *Stephanie J. Quade*, Assistant Counsel, Office of Naval Research, Office of Counsel, U.S. Department of the Navy, of Arlington, VA, of counsel.

*Robert Charles Rutherford Jr*, Office of General Counsel, The Pennsylvania State University, of State College, PA, for Defendant-Intervenor.

---

[*]    Pursuant to the protective order entered in this case, this opinion was filed initially under seal.  The parties provided proposed redactions of confidential or proprietary information.  In addition, the Court made minor typographical and stylistic corrections.

## OPINION AND ORDER

**SOMERS,** Judge.

On December 29, 2021, Plaintiff, ACI Technologies, Inc. ("ACI"), filed a protest in this Court challenging the United States Navy's award of an Indefinite Delivery, Indefinite Quantity ("IDIQ") contract to Defendant-Intervenor, The Pennsylvania State University ("PSU"), for support services to operate and manage the Navy Manufacturing Technology ("ManTech") Program, Electronics Manufacturing Center ("Center," "EM," or "EM COE"). *See generally* ECF No. 1 ("Compl."). Plaintiff—the only other offeror in the procurement—alleges that the Navy, through its Source Selection Authority ("SSA"), was arbitrary and capricious in its evaluations of the solicitation's Factor 7 (Past Performance), Factor 8 (Cost/Price), and Technical Factors 1–3, and that the SSA, therefore, erred in its resulting best value tradeoff analysis and source selection decision. *Id.* Plaintiff and the government each moved for judgment on the administrative record. *See generally* ECF Nos. 23 ("Pl.'s MJAR"), 26 ("Gov.'s Cross-MJAR").

On June 10, 2022, the Court issued an order denying Plaintiff's motion for judgment on the administrative record (and accompanying request for a permanent injunction), explaining that Plaintiff had failed to meet its burden to establish that it is entitled to judgment because the Navy reasonably evaluated proposals under all of Plaintiff's challenged factors and did not err in its tradeoff analysis and best value determination. ECF No. 35. Plaintiff thus had not proved by a preponderance of the evidence that the Navy made prejudicial errors in evaluating the proposals. This opinion provides the reasons behind the Court's June 10th order—denying Plaintiff's motion for judgment on the administrative record and granting the government's cross-motion for judgment on the administrative record—and directs the Clerk of the Court to enter judgment accordingly.

## BACKGROUND AND PROCEDURAL HISTORY

### A.    The Solicitation

On April 20, 2020, the Navy issued Request for Proposal ("RFP") N00014-20-R-0006, seeking proposals for the "management, administration and technical oversight of the Navy Manufacturing Technology (ManTech) Electronics Manufacturing Center" and additional special projects. AR 314. The goal of ManTech centers, pursuant to 10 U.S.C. § 4811(a), is to further national security objectives "through the development and application of advanced manufacturing technologies and processes that will reduce the acquisition and supportability costs of defense weapon systems and reduce manufacturing and repair cycle times across the life cycles of such systems." AR 403.

There are currently seven ManTech Centers of Excellence ("COE"), "and they serve as focal points for the development and technology transfer of new and advanced manufacturing processes and technology in a cooperative environment with industry, academia, and the Naval Research Enterprise." AR 304. The Navy ManTech Program is "focused on affordability improvements for specific key acquisition platforms and capability acceleration as defined in the

Navy ManTech Investment Strategy." *Id*. "ManTech helps these Navy programs achieve their respective affordability goals by transitioning developed manufacturing technology which, when implemented, results in needed cost reduction or cost avoidance." *Id*. This procurement relates to the ManTech COE for electronics manufacturing. *See* AR 404.

The solicitation's Statement of Work ("SOW") identifies the core mission of the EM COE as:

> develop[ing] and facilitat[ing] the transition of electronics manufacturing technologies to reduce the cost and time to deploy electrical and electronic (digital and analog) systems as well as the supporting power storage and distribution infrastructure to Naval ships, aircraft, submarines, and unmanned systems. In accomplishing its mission, the Center will work closely with the Navy's acquisition community as well as naval shipyards, as well as the electronics manufacturing (EM) industrial base to identify manufacturing technology issues that negatively impact transition of EM products to the fleet, with respect to both cycle-time and cost.

*Id*. The SOW lists areas and types of technology the awardee would work on related to electronics manufacturing, including various types of semiconductors and nanoelectronics. AR 404–05.

Per the solicitation, proposals for the EM COE contract would be evaluated on eight factors:

- Factor 1: COE Operations and Management
- Factor 2: Project Development and Management
- Factor 3: Key Personnel and Staffing
- Factor 4: Small Business Participation
- Factor 5: Facilities
- Factor 6: Cost Share
- Factor 7: Past Performance
- Factor 8: Price (Cost Plus Fixed Fee)

AR 369, 1892. Factors 1 through 7 are listed in "descending order of importance and when combined, are significantly more important than Factor 8." AR 397, 1892. As this is a best value procurement, "[t]he 'best-value' determination will be a trade-off decision between Factor 8 and Factors 1 through 7." *Id*.

Technical Factors 1–3 and 5–6 were evaluated and scored with the following ratings:

| Rating | Description |
| --- | --- |
| Outstanding | Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low. |

| Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate |
|------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| Unacceptable | Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable.<br>Proposal is unawardable. |

AR 390.

For Factor 1, Section M alerts offerors that the Navy would evaluate its "approach to accomplishing . . . [the] Statement of Work," along with its approach to managing and operating the Center of Excellence.  AR 391.

For Factor 2, the Navy assessed how the offeror's proposal demonstrated its approach to project development and management by evaluating a proposal's "approach to understanding ONR's task requirements outlined in Section C of this solicitation and . . . [the] Statement of Work" along with the proposal's demonstration of "detailed knowledge of and/or experience in performing the identified tasks in the same or similar environment(s)," among other things.  AR 393.

Factor 3, Key Personnel, generally assessed the proposed key personnel's resumes, qualifications, and experience with similar contracts or projects.  AR 394.

Per the solicitation, Factor 7 (Past Performance) was evaluated in two phases.  The first phase assessed the relevancy of up to three prior examples of past performance that offerors performed within the five years preceding the date of the solicitation.  AR 376.  For phase one of the past performance evaluation, each past performance example was assigned a rating as set forth in the following table:

| Rating | Description |
|--------|-------------|
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

AR 390; *see also* AR 376–77.

Relevancy refers to aspects of an offeror's performance history that would give the government confidence that the offeror "will satisfy the current procurement." AR 396. This includes projects that were similar in magnitude, scope, and complexity to the procurement at hand. *Id.*; *see also* AR 376–77 (defining magnitude as the "similarity of the dollar value of the work actually performed," scope as "experience in the areas defined in the Statement of Work," and complexity as the "similarity of technical and managerial intricacy and required coordination of efforts that exist between" the examples and the instant procurement's SOW). Offerors were instructed to provide the relevant SOW and CPARS for each past performance example provided. AR 376.

For the second phase of the past performance evaluation, each proposal was assigned one of the following confidence ratings:

| Rating | Description |
|---|---|
| Substantial Confidence | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| Limited Confidence | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |
| Unknown Confidence (Neutral) | No recent/relevant performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. |

AR 390–91. The government reserved to itself the right to review external sources of information to evaluate past performance examples but reiterated the burden on the offeror to provide "detailed, current, accurate and complete past performance." AR 377.

For Factor 8 (Cost/Price), the solicitation provides that proposed prices would be assessed for both cost realism and reasonableness, and it notes that "[t]he Government's estimated probable cost may differ from the Offeror's proposed cost." AR 378; *see also* AR 396–97. The solicitation describes the cost realism analysis as "the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate" to determine consistency and a thorough understanding of the work to be performed. AR 396. The reasonableness analysis would assess whether the proposed cost would "exceed the amount incurred by a prudent person in the conduct of a competitive business." AR 397.

By the solicitation's closing date of June 24, 2020, only two offerors—Plaintiff and PSU—had submitted proposals. *See generally* AR Tabs 19–20. Plaintiff is the incumbent EM

COE contractor. Pl.'s MJAR at 2; *see also* AR 1245–46. PSU currently operates the Navy's Electro-Optics Center of Excellence ("EOC" or "EO COE") and submitted such work as one of its three past performance examples. *See* AR 1270.

After the Navy received the proposals, it determined that discussions were necessary, and a competitive range was later established on December 15, 2020. AR Tab 25. Both offerors were provided an agenda for discussions along with redacted technical, past performance, and price evaluations. *See generally* AR Tabs 32–33.

On January 5, 2021, prior to discussions with the Navy, Plaintiff received a letter from the Defense Contract Audit Agency ("DCAA") establishing its revised provisional billing rates ("PBR") for the fiscal year ("FY") ending December 31, 2020. *See* AR 2011–12. Approximately three weeks later, on January 26, 2021, Plaintiff received another letter from DCAA establishing its FY 2021 PBRs. *See* AR 2013–14. Both letters instructed Plaintiff to begin using these rates immediately "in preparing requests for interim contract payments," that the rates were for "billing purposes only," and that Plaintiff "should not use these rates for other applications such as costs proposals . . . ." AR 2011, 2013.[1] The receipt of these two letters and the language contained within each appears to be standard practice. *See, e.g.*, AR 2288 (DCAA letter to ACI for FY 2018 stating "[t]he established rates are for billing purposes only and you should not use these rates for other applications such as cost proposals or forward pricing rates"); AR 2290 (DCAA letter to ACI for FY 2019 stating "[t]he established rates are for billing purposes only and you should not use these rates for other applications such as cost proposals or forward pricing rates"); AR 2292 (similar DCAA letter to ACI for FY 2020); *see also* AR 1381 (Navy discussions document for Plaintiff citing that "ACI's proposed rates are predicated on the use of Provisional Billing Rates on file with DCAA dated 10 Feb 2020 and ending 31 Dec 2020. This is consistent with ACI proposal practices on prior ManTech Task Orders issued under N00014-16-D-4004; therefore, the Contracting Officer take no exceptions to the application of the rate to the base.").

Plaintiff's discussions with the Navy occurred on February 9, 2021, and PSU's occurred the following day. AR 2277. Thereafter, the Navy requested that both offerors submit Final Proposal Revisions ("FPR"). *See generally* AR Tab 36. PSU and Plaintiff submitted their FPRs by February 20, 2021. *See generally* AR Tabs 37–38.

Following receipt of offerors' FPRs, the Navy evaluated and assigned the following ratings for the technical factors in the solicitation:

| Offeror | Factor 1 | Factor 2 | Factor 3 | Factor 4 | Factor 5 | Factor 6 |
|---------|----------|----------|----------|----------|----------|----------|
| ACI | Good | Good | Outstanding | Outstanding | Outstanding | Outstanding |
| PSU | Good | Outstanding | Acceptable | Outstanding | Outstanding | Outstanding |

AR 1918.

---

[1] As is discussed later in this opinion, despite this statement, Plaintiff did in fact use PBRs (FY 2019) in its proposal.

For Factor 7, Past Performance, the Navy assigned the following recency/relevancy ratings for each past performance example, as well as the following confidence rating for both proposals:

| Offeror | Phase I | | | | Phase II |
|---------|---------|---|---|---|---------|
| | Example 1 Relevance Rating | Example 2 Relevance Rating | Example 3 Relevance Rating | | Overall Confidence Rating |
| ACI | Very Relevant | Very Relevant | Somewhat Relevant | | Substantial |
| PSU | Very Relevant | Not Relevant | Not Relevant | | Substantial |

AR 1920.  As to PSU's EO COE work ("Example 1"), the SSA

> note[d] that [it] is the most relevant of [PSU's] examples and shows that PSU has performed the same, identical statement of work in the past.  The other two examples are not relevant as they showcase more of the technical aspects of PSU's work vice the requirements for center operations and project management. While the two examples are deemed to be not relevant, the first example's relevancy overshadows the other two examples.

AR 1279.

Finally, as to Factor 8 (Cost/Price), the Government Probable Cost at the time of discussions was determined to be $10,644,077 for Plaintiff, and $10,352,141 for PSU, leaving a delta of $291,936 in PSU's favor.  AR 1920.  However, after discussions,

> [i]n [June] 2021, another ManTech Contracting Officer was preparing a Cost Analysis for an ACI award . . . .  The Provisional Billing Rate (PBR) supplied to that Contracting Officer differed from all prior year PBR's on file with DCAA/DCMA. He reached out the PCO on this action to ascertain why the change had occurred.

> Upon reading the PBR, the PCO noted that ACI had changed their indirect rates and had been directed to start billing at the new rates. The PCO then reached out to DCAA to ask if this was the most up to date information. DCAA stated it was and then the PCO utilized the FY21 PBR rates to ascertain the Government's cost risk. The qualitative results of the recalculation are documented in the Cost Realism Addendum.

*Id.*[2]  Based on this "most up to date rate information," the revised Government Probable Cost was determined to be $12,467,592 for Plaintiff, and $10,056,145 for PSU, leaving a delta of $2,411,448 in PSU's favor.  *Id.*

---

[2] In evaluating the proposals, the Contracting Officer determined that it was appropriate to apply both offerors' most recent indirect rates to the proposals, which resulted in changes to both offerors' estimated prices. AR 2018.  Regarding the change in Government Probable Cost for Plaintiff, the Contracting Officer determined that "seek[ing] out the most recent rate information due to the length of time the proposals have been in evaluation" was appropriate.  AR 1787.  In utilizing the new DCAA PBR rates, the Contracting Officer noted that Plaintiff had utilized PBRs to "substantiate their proposed

The SSA then comparatively evaluated the proposals, concluding that

> [i]n Factors 1, 4, 5, 6, and 7, I see no clear advantages for either the ACI or PSU approaches.  The PSU proposed approach in Factor 2 outweighs the ACI approach. The ACI approach in Factor 3 outweighs the PSU approach; however, Factor 2 is more heavily weighted than Factor 3 which gives PSU the technical advantage. Both offerors received Substantial Confidence in Past Performance, which leaves PSU with the overall advantage in the non-price Factors 1-7.

AR 1921.  Weighing the technical factors against the price factor, the SSA determined that

> [t]he PSU proposal provides the Government with the superior technical approach, based not only upon the ratings, but upon the supporting rationale described in this Decision and in reference (b). The PSU proposal provides the Government with the highest overall confidence rating for Past Performance. The PSU proposed price (cost plus fixed fee) is lower than the ACI proposed price (cost plus fixed fee) with the difference in the two Government Evaluated proposals being a $2,411,448 difference or approximately 19%.
>
> As a result, I am unable to reasonably determine that ACI's Key Personnel (Factor 3) alone are worth a 19% premium to the Government, when the proposed PSU technical approach is exceptional and includes strong technical personnel, poses a very low risk to the Government for Past Performance, and is the lowest priced offeror. I note that even if I had not sought out the most recent rates for each offeror that my award decision would remain the same. Given the strength of the PSU proposal, I do not find the ACI key personnel and staffing approach to be worth any premium.
>
> Based on my independent assessment of the proposals against the solicitation and its stated evaluation factors, I concur with the Technical Evaluation Report, the Past Performance Report, and the Cost Realism Report and addendum, and it is my decision as the Source Selection Authority for this requirement that the PSU proposal offers the best value to the Government.

AR 1921.

The Navy awarded the EM COE contract to PSU on August 13, 2021, and Plaintiff requested a debriefing the following day.  AR 1933–34.  In the debriefing slides, the Navy informed Plaintiff that its proposal and PSU's had "similar technical approaches with no clear advantage of one offeror over another" but that PSU's higher rating under Factor 2 outweighed Plaintiff's higher rating under Factor 3, given that the proposals were assigned the same rating

---

indirect rates in their solicitation" for this proposal, and that under a prior contract, "all sampled ACI proposal submissions relied on PBR's" and that because "the Contracting Officer felt that if the PBR has been consistently used for estimating purposes, that the application of the most recent PBR rates at this action was appropriate."  AR 1789.

for Factor 1. AR 1969. Further, the Navy stated that "[a]s the ACI proposed price and the ACI adjusted price were higher than PSU, the SSA could not reasonably award to ACI." AR 1970.

## B.    Plaintiff's Protest at the Government Accountability Office

On September 3, 2021, Plaintiff filed a protest at the Government Accountability Office ("GAO") challenging the award to PSU. *See generally* AR Tab 60. There, Plaintiff raised many of the arguments it does in this Court, including that the Navy erroneously evaluated Factors 1–3, 7, and 8 of the competing proposals. *See generally* AR Tab 60; AR 2041–42. Ultimately, GAO did not find prejudicial error in any of the assigned technical ratings, nor in the Navy's overall evaluation, and denied the protest. *See* ACI Technologies, Inc., B-420129.1, 2021 WL 6050173 (Comp. Gen. Dec. 10, 2021). According to GAO,

> [W]e have concluded that the agency reasonably determined that PSU's proposal was technically superior to ACI's proposal. Further, there is no dispute that ACI's proposed cost/price was higher than PSU's, and ACI has identified no meaningful basis for challenging the agency's evaluation of PSU's proposed cost/price. On this record, we find no basis to question the agency's award to PSU on the basis of its technically-superior, lower-cost/priced proposal.

*Id.* at 13 (AR 4183).

## C.    The Instant Protest

Plaintiff filed this bid protest on December 29, 2021. The complaint and Plaintiff's motion for judgment on the administrative record allege that the Navy failed to properly evaluate Factor 7, Past Performance; failed to reasonably evaluate Factor 8, Price/Cost, including by using the FY 2021 DCAA PBRs and by failing to conduct clarifications or meaningful discussions with Plaintiff regarding its use of such rates; unreasonably evaluated Technical Factors 1–3; and failed to conduct a proper tradeoff analysis and best value determination. *See* Compl. ¶¶ 191–202; *see generally* Pl.'s MJAR. Plaintiff alleges that in relying on erroneous evaluations, the SSA's best value and tradeoff analysis was inherently flawed, Compl. ¶¶ 203–05, and that "[i]f the Navy had made its determinations consistent with the RFP, FAR and CICA, the Navy would have awarded the contract to ACI," *id.* ¶ 205.

In general, the government counters that what Plaintiff alleges constitute erroneous evaluations are, in fact, nothing more than mere disagreements with the Navy's independent judgment and discretion. *See, e.g.*, Gov.'s Cross-MJAR at 9 (arguing that Plaintiff's allegations "prov[e] nothing more than its disagreement with the SSA's discretion and professional judgment"). As to the Navy's cost evaluation, the government contends that "[b]ecause there is no dispute that ACI's proposal was less favorable under Factor 8 even at the cost ACI claims the Navy should have considered," Plaintiff fails to allege prejudicial error in this procurement. *Id.* at 15.

On April 27, 2022, the Court held oral argument on the motions, and the matter is now ripe for consideration.

**DISCUSSION**

A.    **Legal Standard**

The Tucker Act, as amended by the Administrative Dispute Resolution Act, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . ." 28 U.S.C. § 1491(b)(1). In such actions, the Court "shall review the agency's decision pursuant to the standards set forth in section 706 of title 5." 28 U.S.C. § 1491(b)(4). Accordingly, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. Under such review, an "award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

On the first ground, "courts have recognized that contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *Id.* (citations and internal quotations omitted). Thus, the Court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, . . . and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1332–33 (citations and internal quotations omitted). On the second ground, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333 (citation and internal quotations omitted). In the case of a negotiated procurement, such as a "best value" procurement, the burden on a plaintiff of proving an award was arbitrary, capricious, an abuse of discretion, or contrary to law is heavier than it is in other protests. *See, e.g.*, *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 995 (Fed. Cir. 1996) ("This court . . . must afford great deference to agencies' decisions in relation to procurement.").

Bid protests are generally decided on cross-motions for judgment on the administrative record, pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). RCFC 52.1 requires that the Court "make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354 (Fed. Cir. 2005). "Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record." *Id.* at 1355–56. Therefore, in reviewing cross-motions for judgment on the administrative record, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Jordan Pond Co., LLC v. United States*, 115 Fed. Cl. 623, 630 (2014).

However, before the Court can proceed to the merits of a bid protest, a protestor must establish that it has standing. *Castle v. United States*, 301 F.3d 1328, 1337 (Fed. Cir. 2002) ("Standing is a threshold jurisdictional issue, which . . . may be decided without addressing the merits of a determination."); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing [the] elements [of

standing].").  "It is well-established that the plaintiff bears the burden of establishing the court's jurisdiction to a preponderance of the evidence."  *Brandt v. United States,* 710 F.3d 1369, 1373 (Fed. Cir. 2013).  In bid protests,"[o]nly an 'interested party' has standing to challenge a contract award."  *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (citing *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006); 28 U.S.C. § 1491(b). This means that in bid protests, standing "is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract."  *Am. Fed'n of Gov't Emps., AFL-CIO v. United States,* 258 F.3d 1294, 1302 (Fed. Cir. 2001).  Accordingly, Plaintiff must prove two elements to establish it has standing: (1) that it is an actual or prospective bidder/offeror, and (2) that it possesses a direct economic interest in the award of the contract.  *CGI Fed. Inc. v. United States*, 779 F.3d 1346, 1348 (Fed. Cir. 2015).

Generally, in the post-award bid protest context, the "direct economic interest" prong of the standing inquiry requires a plaintiff to "show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process."  *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (citation omitted); *see also Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) ("A party has been prejudiced when it can show that but for the error, it would have had a substantial chance of securing the contract.") (citations omitted).

## B.    Analysis

The Court finds—and the government did not contest—that Plaintiff has standing to pursue the instant protest.  Plaintiff was an offeror and, in fact, the only other offeror in the challenged procurement, and were Plaintiff successful on all grounds raised in its protest— finding error in the Navy's past performance evaluation of PSU, cost evaluations, technical factors evaluation, and tradeoff analysis—there is sufficient reason to conclude that Plaintiff stood a substantial chance of receiving the contract.

On the merits, however, as the following discussion demonstrates, Plaintiff fails to prove by a preponderance of the evidence any of its contentions; therefore, it has not shown that it was prejudicially harmed by agency error.

### 1.    Plaintiff Has Not Established that the Navy Unreasonably Evaluated Proposals Under Factor 7, Past Performance

Plaintiff's first and primary ground for the instant protest challenges the Navy's past performance evaluation under Factor 7, which, notably, is the least important of all non-cost factors in the procurement and the second least important factor overall.  *See* AR 397 ("Factors 1 through 7 are listed in descending order of importance and when combined, are significantly more important than Factor 8.").

According to Plaintiff, "[t]he Navy unreasonably concluded that ACI and PSU have equivalent past performance and that PSU's EOC work was the 'same, identical' as the RFP SOW."  Pl.'s MJAR at 10 (citing AR 1279 (SSA noting "that [PSU's EOC work] is the most

relevant of the examples and shows that PSU has performed the same, identical statement of work in the past. . . . While [PSU's other two] examples are deemed to be not relevant, the first example's relevancy overshadows the other two examples."). Plaintiff contends that "ACI has highly relevant electronics manufacturing past performance," as the incumbent ManTech COE for electronics manufacturing, while "[i]n contrast, PSU has markedly less relevant past performance" and thus "the CO materially erred in finding that PSU's EOC work was the same, identical to the RFP EMC SOW." Pl.'s MJAR at 12 (citations omitted).[3]

At the outset, the Court notes the steep climb Plaintiff faces, for "[i]t is well-established that this Court must afford an agency substantial deference in evaluating an offeror's past performance." *CW Gov't Travel, Inc. v. United States*, 154 Fed. Cl. 721, 748 (2021) (citing *Am. Auto Logistics, LP v. United States*, 117 Fed. Cl. 137, 186 (2014), *aff'd*, 599 F. App'x 958 (Fed. Cir. 2015) ("A protestor must overcome a 'triple whammy of deference by demonstrating by a preponderance of the evidence that the SSA lacked *any* rational basis' to assign a given past performance rating.")); *see also Tech. Innovation All. LLC v. United States*, 149 Fed. Cl. 105, 138 (2020) ("The agency's subject-matter experts are best suited to determine whether and to what extent the experience reflected in a past performance example instills confidence that the offeror will successfully perform and meet the needs of the agency on the contract at issue."); *FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 396 (2011) (quoting *Univ. Rsch. Co. v. United States*, 65 Fed. Cl. 500, 505 (2005) ("When the Court considers a bid protest

_____

[3] Plaintiff also contends that the CO's past performance analysis of PSU's submitted examples was flawed because "[t]he CO relies solely on alleged personal knowledge or *ipse dixit* conclusions and failed to reasonably assess or document the basis for evaluation." Pl.'s MJAR at 12. But Plaintiff makes no showing that personal knowledge is *prohibited* under the solicitation. Factor 7's evaluation criteria provides that "ONR personnel involved in this source selection which are noted as points of contact for any submitted examples *will NOT be contacted* regarding performance as a means of controlling potential bias, or appearance of bias, in the source selection." AR 377 (emphasis added). Although the CO for the instant procurement is indeed listed as a point of contact for PSU's first example, *see* AR 785, by the express terms of the solicitation she was not "contacted"—rather, she simply performed the determination herself. More importantly, Plaintiff itself benefited from the CO's personal knowledge, so it cannot be said that personal knowledge of PSU's past performance prejudiced Plaintiff in any way. *See* AR 1248 (CO/SSA noting that for two out of three of Plaintiff's submitted past performance examples, "[b]ased on *my first-hand knowledge* of ACI's performance on the two Very Relevant ManTech contracts, it is clear that ACI is capable of meeting the SOW requirements for this effort.") (emphasis added). In other words, even if Plaintiff's argument were correct, it cannot show prejudice because it benefitted from the same alleged error. *Ascendant Servs., LLC, v. United States*, No. 22-72 C, 2022 WL 2063327, at *7 (Fed. Cl. May 16, 2022) ("Therefore, even assuming the Army erred, . . . Plaintiff itself benefited from the Army's error in the same way that Caelum and the other three offerors did. Accordingly, if Plaintiff's interpretation was correct, it would be barred from raising this argument because Plaintiff actually benefitted from the alleged misinterpretation.") (citing *VS2, LLC v. United States*, 155 Fed. Cl. 738, 768 (2021) ("The simple fact is that VS2 cannot now complain about Vectrus's and the government's interpretation of the Solicitation when VS2 relied upon the very same interpretation when preparing its proposal.")); *see also Elevated Techs., Inc. v. United States*, No. 22-0004 C, 2022 WL 1843170, at *11 (Fed. Cl. May 6, 2022) (Court agreeing that "a bidder cannot establish prejudice if it 'benefited from the same potentially unlawful discretion from which the awardee benefitted.'") (quoting *G4S Secure Integration, LLC v. United States*, No. 21-1817 C, 2022 WL 211023, at *8 (Fed. Cl. Jan. 24, 2022)).

challenge to a past performance evaluation conducted in the course of a negotiated procurement, 'the greatest deference possible is given to the agency.'")).

As will be explained, Plaintiff fails to show that the substantial deference to which the Navy is entitled was abused with regard to the past performance evaluations in the instant procurement.  To provide context, however, the Court first reviews the instructions for offerors as well as the evaluation criteria for Factor 7.  First, offerors were instructed as follows:

**Section L, 3 Preparation of Past Performance Proposals**

(A) General

. . .

(3) The Offeror's Past Performance Volume shall then include three recent/relevant examples. Offerors shall use Attachment 5, Past Performance Information Form (See Section J for a copy of the document), when preparing their past performance examples. This form will be used for all three examples submitted.

(4) The Offeror's Past Performance Volume shall also include copies of the offeror's PWS/SOW for their submitted examples. Copies of the PWS/SOW shall be placed directly behind the example they support.

. . .

(B) Phase I – Recency and Relevancy

(1) The Government shall use the following to determine recency and relevancy for the three (3), and no more than three (3), submitted examples:

. . .

(b) Relevancy will be evaluated based on the magnitude, scope, and complexity of the example and its relevance to the ONR SOW. The Government defines each of these areas below:

Magnitude of effort: the measure of the similarity of the dollar value of work actually performed that exists between the Statement of Work and an offeror's submitted reference.

Scope: experience in the areas defined in the Statement of Work.

Complexity: the measure of similarity of technical and managerial intricacy and required coordination of efforts and disciplines that exist between the Statement of Work and an offeror's performance on a submitted reference. For complexity, not

only will the tasks performed be considered, but also an offeror's ability to coordinate the tasks (e.g. concurrent performance requirements).

(C) Phase II– Confidence Evaluation

All offerors who are found to be recent and relevant shall be evaluated for Confidence.

. . .

While the government may elect to consider data from other sources, the burden of providing detailed, current, accurate, and complete past performance information rests with an offeror.

Note that ONR personnel involved in this source selection which are noted as points of contact for any submitted examples will NOT be contacted regarding performance as a means of controlling potential bias, or appearance of bias, in the source selection.

AR 376–77.  Second, the solicitation provided for the evaluation of Factor 7, in relevant part, as follows:

**Section M, 3 Evaluation of Past Performance**

**Factor 7: Past Performance.**

Past performance consists of a two-phase rating system that results in a single overall assessment of an offeror's probability of meeting the solicitation requirements.

The first phase is an assessment of the relevancy of each past performance example provided by an offeror.

In establishing what is relevant for the acquisition, consideration will be given to those aspects of an offeror's contract performance history that would give the greatest ability to measure whether the offeror will satisfy the current procurement. Common aspects of relevancy include similarity of magnitude, scope, and complexity.

All offerors who are found to be recent and relevant shall be evaluated for the second phase of the assessment which is Confidence.

In order to evaluate Confidence, the government may review other sources of information for evaluating past performance. . . .

> While the government may elect to consider data from other sources, the burden of providing detailed, current, accurate, and complete past performance information rests with an offeror.

AR 396.  Thus, an offeror's past performance examples—including the respective SOWs—would be individually evaluated and compared with the instant SOW for recency and relevance, and, if found sufficient under both, the proposal would receive an overall confidence rating.

Plaintiff asserts that "the Navy effectively disregarded the RFP criteria by failing to reasonably compare SOWs and document the basis for its 'same, identical' finding."  Pl.'s MJAR at 11.  Yet, from the Court's review of the administrative record, the SSA's determinations were both reasonable and documented.  *See, e.g.*, AR 1310 (SSA noting that "with the exception of the Statement of Work, paragraph 1.3 Technology Focus Areas, the work done by the contractors who operate the Centers is almost identical."); AR 1920 (Source Selection Decision providing that "[a]s both ACI and PSU have, and are currently, successfully operating ManTech Centers there is very little risk to the Government, based on the past performance, to award a contract to either contractor.").[4]

Nonetheless, almost the entirety of Plaintiff's past performance objection contends that the technology involved in electronics manufacturing is materially different from the technology involved in PSU's electro-optics work, and, for that reason, the agency's past performance evaluation of PSU was irrational.  *See, e.g.*, Pl.'s MJAR at 13 ("Electro-Optics technology and Electronics Manufacturing technology for defense systems are separate and entirely distinct. . . . The specific resources, expertise and capabilities required to address electronics and electro-optics projects are separate and highly particular to their respective disciplines.") (emphasis omitted).  The Court wonders whether, under Plaintiff's definition of relevancy, any offeror other than Plaintiff would have relevant past performance experience.

Contrary to Plaintiff's desired technology-specific test for relevancy, the solicitation made clear that offerors should submit SOWs of past performance examples, which would then be compared with the SOW for the instant procurement.  *See* AR 376 ("The Offeror's Past Performance Volume shall also include copies of the offeror's PWS/SOW for their submitted examples. . . . Relevancy will be evaluated based on the magnitude, scope, and complexity of the example and its relevance to the ONR SOW.").  It is telling that Plaintiff only belatedly—three pages into its past performance argument—invites the Court to compare PSU's EOC SOW with the instant SOW.  *See* Pl.'s MJAR at 13.  But perhaps even more telling is Plaintiff's failure to cite any specific differences in the two SOWs that might support its argument; rather, it seems Plaintiff wants the Court to do that job for it.  If the two SOWs were in fact different in material respects, the Court assumes Plaintiff would have been quick to so demonstrate by comparing the two SOWs in order to attempt to support its argument.  Indeed, instead of showing the Court the

---

[4] Plaintiff contends that "[t]he CO's findings that PSU *had equivalent past performance* to ACI is arbitrary and contrary to the RFP and AR."  Pl.'s MJAR at 12 (emphasis added).  But Plaintiff misstates the facts.  The CO/SSA did not find that the two offerors had equivalent past performance; rather, she awarded the same *rating*.  Nothing in the solicitation required an awardee to have previously performed *this* contract.  Achieving that rating did not require "equivalent" past performance, as Plaintiff seems to suggest.

material differences between the two SOWs, Plaintiff supports its argument that the SOWs were different not by reference to the SOWs but by reference to the pre-solicitation Independent Government Cost Estimate.[5]

Although the Court generally should not venture into "the minutiae of the procurement process," *E.W. Bliss Co.,* 77 F.3d at 449, the Court nevertheless reviewed the two SOWs and finds nothing unreasonable with the SSA's determination that PSU's EOC example is "Very Relevant."  For example, *both* PSU's EOC SOW and the instant SOW identically provide that:

> The Center Contractor shall, in accordance with the provisions of this Contract, provide the resources, intellectual leadership, and management expertise necessary and appropriate for managing and operating the Center to accomplish its primary mission. *The primary mission of the Center is to develop advanced manufacturing technologies* and deploy them in the U.S. center specific industrial base with the goal of facilitating industry improvements and ultimately reducing the cost and time required to transition center related technology into Navy and DoD system applications as defined in the ONR ManTech Investment Strategy.

AR 404 (instant SOW) (emphasis added); AR 3592 (PSU's EOC SOW) (emphasis added).

Additionally, the subsections of the two SOWs concerning the awardee's expected scope of work are also strikingly similar.  For practical perspective, the Court takes it upon itself to demonstrate the differences (*or rather, the notable lack thereof*) between PSU's EOC SOW— used below as the base document—and that of the instant electronics manufacturing SOW, with strikes signifying deletions and italics/underlines signifying additions or changes between the two:

> The Contractor shall, with the highest degree of vision, quality, integrity, and technical excellence, maintain a strong scientific and engineering resource base responsive to manufacturing technology issues of national importance. The scope of work of this Contract includes:
>
> 1. Operating and managing the COE in an efficient, cost effective, and innovative manner to accomplish its core mission of developing and facilitating the implementation of advanced ~~electro optics~~ *electronics* manufacturing technologies to U.S. ~~EO~~ industry to reduce the cost and time to design, build and test critical naval sensor technology.

---

[5] Plaintiff asserts that "[t]he Navy admits 'ManTech centers cannot be compared to each other, nor their historical pricing used, as they centers do not perform same/similar work for an accurate comparison.'" Pl.'s MJAR at 13 (quoting AR 103).  At first read, Plaintiff's selected quote appears unfavorable to the government on its face.  Yet, Plaintiff provides no context for the quote, which is actually drawn from the pre-solicitation Independent Government Cost Estimate.  *See* AR Tab 3.  As the IGCE is relevant to the Navy's price evaluation, the Court grants Plaintiff's selected quote little weight as to how the agency would evaluate past performance and offerors' submitted SOWs.  Moreover, even the IGCE goes on to observe that "[t]he Electro Optics Center . . . is the only other Navy ManTech contractor run center that may have similarities to EMC due to the function of the Center . . . ."  AR 103.

2. Organizing, facilitating and executing an ~~EO~~ *EM* manufacturing-focused project selection process, supporting the key naval platform programs identified by the ONR ManTech Investment Strategy and the ONR Program Officer, in order to recommend technical work. Projects selected should be important to both the Navy and the naval industrial base that builds and/or repairs naval platforms.

3. Initiating and managing ManTech projects approved by the ONR Program Officer. Management of projects should include the use of an earned-value or similar methodology that tracks and relates technical progress, schedule, and funding.

4. Providing support of special projects or non-ManTech funded projects that relate to the COE mission, as directed by the ONR Program Officer.

5. Providing all required reporting, including COE-level and project-level deliverables, for the evaluation of the technical and financial progress of the Center and of each technical project.

6. Planning, coordinating, and conducting outreach activities and projects to increase awareness of the Center and to facilitate technology transition and implementation of ManTech-developed manufacturing technology at additional shipyards and industrial facilities beyond the initial implementation site of any particular technical project.

7. Traveling in support of the Center. Travel shall be planned and conducted in such a fashion to provide maximum flexibility and use of time in support of the COE. All travel shall be in accordance with applicable federal travel regulations.

The Center contract will be structured with multiple task orders. This Statement of Work covers two general activity areas critical to the Center's accomplishment of its mission: First Task Order: CoE Center Operations and Management and Second Task Order: Project Development and Management. Both Task Orders will be numbered after execution of the Base Award Indefinite Delivery/Indefinite Quantity (IDIQ) contract.

AR 3593–94 (PSU's EOC SOW) *contrasted with* AR 405–06 (instant SOW).  In similar fashion, the sections in each SOW outlining the specific task orders are, likewise, strikingly similar.  The only noticeable changes are mere technicalities—changing, for example, "electro-optics" to "electronics," but otherwise requiring the same management, operation, and activities.  *Compare* AR 3594–3602 (PSU's EOC SOW) *with* AR 406–14 (instant SOW).

These similarities are all the more impactful when reviewed in conjunction with the solicitation's definition of "scope," one of the factors for evaluating recency and relevancy:

"experience in the areas defined in the Statement of Work."  AR 377.  Frankly, given the substantial deference this Court owes to agencies' past performance evaluations, and when reviewed in the context of the solicitation's *actual* evaluation criteria (not Plaintiff's preferred focus on merely the technological differences), anything less than a "Very Relevant" rating for PSU's EOC past performance example might appear rather arbitrary and capricious.  This is bolstered by the fact that the explanation of how past performance will be evaluated specifically states that: "[i]n establishing what is relevant for the acquisition, consideration will be given to those aspects of an offeror's contract performance history that would give the greatest ability to measure whether the offeror will satisfy the current procurement."  AR 396.  It also must be noted that to any extent that PSU's past performance did not demonstrate the relevant technical expertise (although the Court finds that the record indicates that PSU's past performance did in fact demonstrate the relevant technical expertise), the awardee for this contract "competes all approved projects among industry and selects companies that are technical experts in the project specific area of expertise to perform as subcontractors on the project execution task orders."  AR 2558.

Finally, the Court cannot ignore the fact that of all the non-cost factors for the agency to review, past performance was the lowest in importance.  *See* AR 397 ("Factors 1 through 7 are listed in descending order of importance and when combined, are significantly more important than Factor 8.").  Plaintiff makes no convincing argument as to how the outcome would have changed if the SSA rated PSU's EOC with anything less than "Very Relevant," or had PSU's overall confidence rating received anything less than "Substantial Confidence."  It is possible, for example, that PSU could have received a "Relevant" rating for its electro-optics work, while *still* receiving a "Substantial Confidence" rating for past performance.  Plaintiff identifies nothing in the wording of the solicitation that suggests otherwise.  Yet, that is Plaintiff's burden to prove.  *CW Gov't Travel, Inc.*, 154 Fed. Cl. at 736 ("It is not enough, however, that Plaintiff show that [an agency] misinterpreted the requirements of the RFQ . . . . Plaintiff must also demonstrate that the misinterpretation prejudiced it.") (citing *Info. Tech. & Applications Corp.*, 316 F.3d at 1319 ("To establish prejudice, [plaintiff] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process.")).  Plaintiff must show prejudice.

Accordingly, Plaintiff fails to show that the Navy's past performance evaluation under Factor 8 was anything other than reasonable and consistent with the terms of the solicitation.

## 2.  Plaintiff Has Not Established that the Navy Unreasonably Evaluated Proposals Under Factor 8, Cost/Price

The Court next addresses Plaintiff's objections to the agency's evaluation of proposals under Factor 8, Cost/Price.  Plaintiff's objections are two-fold: (1) it asserts the agency improperly used Plaintiff's updated 2021 DCAA-approved provisional billing rates in conducting its price evaluation of Plaintiff's proposal instead of Plaintiff's 2019 DCAA-approved provisional billing rates provided in its proposal—all without, according to Plaintiff, justification or an opportunity for discussions; and (2) Plaintiff asserts the agency failed to account for additional likely start-up and other costs in its price evaluation of PSU's proposal.  In

short, Plaintiff objects to how the Navy evaluated Plaintiff's proposal under Factor 8, as well as how the Navy evaluated PSU's proposal.

For purposes of demonstrating prejudicial harm, it is possible Plaintiff would need to succeed on the merits of both price arguments. Recall, Plaintiff's proposal—using Plaintiff's preferred FY 2019 PBRs—was at minimum $291,936 more expensive than PSU's. AR 1920. Accordingly—and absent a finding of prejudicial error elsewhere in the procurement—Plaintiff would need to establish that the agency erred in using Plaintiff's updated FY 2021 PBRs *and* that the agency erred in failing to account for additional costs to the government in PSU's proposal. Only then might Plaintiff's proposal, at least from a pure cost perspective, be more competitive with PSU's. The Court, however, need not weigh such a hypothetical, as Plaintiff for the following reasons falls short on both arguments.

### a. The Navy's cost/price evaluation of Plaintiff's proposal

As to its own proposal, Plaintiff contends "[t]he Navy's price evaluation was fundamentally unfair because the Navy materially adjusted ACI's overhead rates without disclosure to ACI and opportunity to respond." Pl.'s MJAR at 16. According to Plaintiff, "[t]he CO concluded that ACI's evaluated price was significantly higher than PSU, based on the Navy's dramatic 17% adjustments to ACI's proposed overhead rates," which Plaintiff finds "procedurally defective and unreasonable" because "[t]he Navy made the adjustments *without notice to ACI and an opportunity to respond*." *Id.* at 17 (emphasis added). Plaintiff insists its proposal "reasonably reflected the rates ACI expected to maintain had ACI's business commenced as planned, assuming a reasonable schedule for award of the EMC contract." *Id.* (citing AR 544). Furthermore, "[t]he CO's adjustments to ACI's proposal were based entirely on complete substitution of a 2021 DCAA letter providing provisional billing rates," for which "[t]here was no Navy analysis, adjustments or calculation of a probable cost that considered ACI historical, current, and forecasted information." *Id.* at 18 (citing AR 1789–90).

In short, Plaintiff objects to the Navy's use of the PBRs from the 2021 DCAA letter in its price evaluation (instead of using the PBRs from its 2019 DCAA letter), as well as the Navy's use of such rates without notice and opportunity for Plaintiff to, in its view, correct the record. The Court weighs the latter objection first, while also bearing in mind that as a general matter "the nature and extent of a price realism analysis, as well as an assessment of potential risk associated with a proposed price, are generally within the sound exercise of the agency's discretion." *CW Gov't Travel, Inc.*, 154 Fed. Cl. at 739 (quoting *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 357 (2009)).

Immediately problematic for Plaintiff, however, is the fact that the Federal Acquisition Regulation ("FAR") generally does not require agencies to engage in or re-open discussions with an offeror if the matter in question is not, for example, a deficiency or significant weakness. *See* FAR 15.306(d)(3). The instant solicitation did not contemplate deficiencies or weaknesses for purposes of an offeror's cost/price, but rather only for Technical Factors 1–3 and 5–6. *See, e.g.*, AR 390, 1178 (Individual Technical Evaluation cover sheet for "Factors 1-6" explaining "[e]valuators shall describe in detail any 'offsets' an offeror's strength may have in relation to a

weakness").  For those areas that are not deficiencies, significant weaknesses, or adverse past performance information, the FAR grants broad discretion to the evaluating agency:

> The contracting officer . . . is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award.  *However, the contracting officer is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment.*

FAR 15.306(d)(3) (emphasis added); *see also Advanced Data Concepts, Inc. v. United States*, 43 Fed. Cl. 410, 422 (1999), *aff'd*, 216 F.3d 1054 (Fed. Cir. 2000) ("The contracting officer has broad discretion in conducting discussions.").  Simply put, Plaintiff has not directed the Court to any authority that would suggest that the discussions in this matter were unreasonable, or that the SSA acted unreasonably in not flagging for Plaintiff the 2021 DCAA-approved rates that it decided to rely on in the cost realism analysis.[6]

Moreover, given that the SSA would not have awarded the contract to Plaintiff even if Plaintiff's originally proposed FY 2019 PBR rates were used, *see* AR 1921, it is difficult to say that a discussion with Plaintiff about the agency's use of the FY 2021 PBRs was even "encouraged" under FAR 15.306(d)(3), much less mandated.  For instance, would a discussion between the Navy and Plaintiff about Plaintiff's FY 2021 PBR rates versus its FY 2019 PBR rates "enhance materially [Plaintiff's] proposal's potential for award"?  The Court strongly suspects not.

To the extent Plaintiff challenges the meaningfulness of the discussions that it *did* have with the agency, *see* Pl.'s MJAR at 25–26, the Court finds no merit in Plaintiff's assertions. Plaintiff argues that "[t]he Navy was required to conduct fair and meaningful discussions before it closed the procurement and made award," and "[i]ts reliance on the DCAA PBR letter without notice of its concerns to ACI was unreasonable."  Pl.'s MJAR at 26.  Yet, the DCAA PBR letter was relevant only to cost, and "unless an offeror's costs constitute a significant weakness or deficiency in its proposal, the contracting officer is not required to address in discussions costs that appear to be higher than those proposed by other offerors."  *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 669 (2010) (citations omitted); *see also id.* ("[I]f an offeror's costs are not so high as to be unreasonable and unacceptable for contract award, the agency may conduct meaningful discussions without raising the issue of the offeror's costs.") (quotation omitted).  Accordingly, when the CO notified Plaintiff that discussions would occur, she

---

[6] Plaintiff cites for support then-Judge Scalia's "cogent explanation" in *Delta Data Sys. Corp. v. Webster* that "[w]hen . . . the new information is of uncertain import, is likely to determine the award, and is of such a nature that the offeror is likely to be able to make a significant contribution to its interpretation, it is an abuse of discretion for the agency to act on the basis of the information without giving the offeror an opportunity to discuss it."  Pl.'s MJAR at 16–17 (quoting *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 203 (D.C. Cir. 1984)).  The government notes that the key facts in that case are "inapposite to the cost-realism analysis at issue here."  Gov.'s Cross-MJAR at 17, n.2.  But the Court also notes that Plaintiff's own citation, if adopted here, proves Plaintiff's downfall, as the 2021 DCAA-approved PBRs (versus the FY 2019 rates) were not, for reasons explained *infra*, "likely to determine the award"—one of *Delta*'s three prongs for finding an abuse of discretion.

explained that "[d]uring discussions, the Government intends to discuss noted weaknesses, deficiencies, and/or noncompliance that exist within your offer"—not pricing.[7]  AR 1218.

Plaintiff also contends that the Navy should have addressed the matter through clarifications.  First and foremost, the decision to engage in clarifications is discretionary under FAR 15.306(a).  Nevertheless, Plaintiff cites for support *L-3 Communications EOTech, Inc. v. United States*, wherein Judge Bush stated that "the decision to not seek clarifications from an offeror must be reasonable under the circumstances of the procurement."  *L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 658 (2008).  Under the circumstances of *this* procurement, in which Plaintiff's evaluated price is higher than PSU's regardless of which PBR rates the agency used, a decision to not seek clarifications as to the FY 2021 DCAA-approved PBRs was entirely reasonable.

Boiled down to its simplest form, Plaintiff's objection is that the Navy should have proactively alerted Plaintiff that its proposed cost (or even its adjusted cost based on the FY 2021 PBRs) is higher than another offeror, and thus less competitive.  Yet, Plaintiff cites no case law or provision of the FAR that mandates such a general courtesy for technically acceptable but higher priced offers.[8]  Rather, "[a]gencies need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others."  *WorldTravelService v. United States*, 49 Fed. Cl. 431, 439 (2001) (quotation omitted); *see also Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States*, 89 Fed. Cl. 735, 743 (2009) ("Mandatory discussions, in other words, are designed to point out shortcomings in an offeror's

---

[7] In the agency's competitive range determination of January 14, 2021, the CO/SSA also makes clear that "[w]hile the Government does not intend to hold discussions with ACI on their proposed price, the Government shall allow ACI to revise their price proposal *should any changes in the technical proposal* necessitate a price change."  AR 1334 (emphasis added).

[8] Plaintiff cites "FAR 15.404, *et seq.*" and FAR 15.306 for the proposition that the Navy should have proactively raised its "confusion" about pricing with Plaintiff, including the Navy's use of the updated overhead rates.  *See* Pl.'s MJAR at 17.  The Court is left to wonder what provision of "FAR 15.404, *et seq.*" Plaintiff intended as support for its assertion, and it will not prosecute Plaintiff's case for Plaintiff.  As to FAR 15.306, Plaintiff points to no affirmative requirement on the agency.  Rather, FAR 15.306 is almost entirely discretionary, placing no obligation of the sort that Plaintiff demands under the instant facts.  Where FAR 15.306 does place an obligation, it is irrelevant to Plaintiff's circumstances in this matter, because Factor 8 was not evaluated as a deficiency or significant weakness, nor was it adverse past performance information.  Specifically, FAR 15.306(d)(3) provides—

> At a minimum, the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, *deficiencies, significant weaknesses, and adverse past performance information* to which the offeror has not yet had an opportunity to respond.  The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award.  However, the contracting officer is not required to discuss every area where the proposal could be improved.  The scope and extent of discussions are a matter of contracting officer judgment.

FAR 15.306(d)(3) (emphasis added).

proposal as judged from the standpoint of the government's stated needs, *rather than from the standpoint of the proposal's relative competitiveness*.") (emphasis added).

As to Plaintiff's more general objection to the agency's reliance on the FY 2021 PBRs in its price evaluation, Plaintiff has made no showing that such use was unreasonable or in any way inconsistent with the solicitation. Rather, as the solicitation clearly states, "[t]he Government's estimated probable cost *may differ from the Offeror's proposed cost*," and "probable cost will be determined *by adjusting each Offeror's proposed cost and fee*, and cost sharing when appropriate, to reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis."  AR 378 (emphasis added).[9]

Moreover, as the government points out, Plaintiff could have brought its own updated, 2021 DCAA-approved billing rates to the SSA's attention during discussions and addressed them head-on, rather than taking issue now at the bid protest stage with the SSA's discovery and use of Plaintiff's updated PBRs.  *See* Gov.'s Cross-MJAR at 17.  In other words, nothing prevented Plaintiff from preemptively flagging for the SSA its updated PBRs and explaining why, in its view, such rates should not be relied on for purposes of the cost realism analysis in this procurement.

Most fatal, however, as the government correctly points out, "ACI's focus on this factor is curious, because the record is undisputed that the agency action that ACI complains about— namely, utilizing ACI's then current DCAA-approved provisional billing rates—ultimately did not make any difference in the award outcome."  Gov.'s Cross-MJAR at 14–15 (citing AR 1921).  In other words, even had the Navy used Plaintiff's preferred FY 2019 PBRs, Plaintiff still would not have stood a substantial chance of receiving the contract, per the SSA's own determination.  *See Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) ("To establish competitive prejudice, a protester must demonstrate that but for the alleged error, there was a substantial chance that [it] would receive an award . . . .") (quotations omitted) (alteration in original).  Often, the Court must endeavor into hypotheticals when considering whether a claimant has been prejudiced by an alleged error in a bid protest.  Here, however, the SSA's own explanation makes crystal clear that Plaintiff was not prejudiced by the agency's use of the 2021 PBRs—even if, assuming arguendo, they were used in error—because Plaintiff's FY 2019 PBRs would still have rendered Plaintiff's proposal more expensive than PSU's.  According to the SSA:

> As a result, I am unable to reasonably determine that ACI's Key Personnel (Factor 3) alone are worth a 19% premium to the Government, when the proposed PSU technical approach is exceptional and includes strong technical personnel, poses a very low risk to the Government for Past Performance, and is the lowest priced

---

[9] The Court also posits that had the SSA been aware of Plaintiff's 2021 DCAA-approved billing rates but used only Plaintiff's 2019 overhead rates in the price evaluation, and had the agency then awarded Plaintiff the contract, it seems reasonable to assume the Court would now be grappling with a bid protest filed by PSU challenging the sufficiency of the agency's cost realism analysis.  The Court declines to weigh in on such a hypothetical but states it only to reinforce the apparent reasonableness of the SSA having "sought out the most recent rates for each offeror" in conducting her price evaluation. AR 1921.

offeror. *I note that even if I had not sought out the most recent rates for each offeror that my award decision would remain the same.* Given the strength of the PSU proposal, *I do not find the ACI key personnel and staffing approach to be worth any premium.*

AR 1921 (emphasis added); *see also* Gov.'s Cross-MJAR at 15 ("Because there is no dispute that ACI's proposal was less favorable under Factor 8 even at the cost ACI claims the Navy should have considered, the Court's inquiry into ACI's protest of the agency's cost/price evaluation need not go any further.").

Thus, the only remaining way Plaintiff could succeed on its Factor 8 arguments is by showing that the agency erred in its cost realism analysis of PSU's proposal *and* such error competitively prejudiced Plaintiff.

### b.   *The Navy's cost/price evaluation of PSU's proposal*

Plaintiff next challenges the sufficiency of the Navy's cost realism analysis (and overall price evaluation) of PSU's proposal, arguing that "[t]he Navy's substitution of the PBRs [in Plaintiff's proposal] was also . . . disparate and unfair" because "[t]he Navy price evaluation did not consider the significant start up costs of PSU establishing an EM Center." Pl.'s MJAR at 26. According to Plaintiff, "[t]he Navy's cost realism of PSU's proposed costs was required to consider the substantial additional costs associated with PSU starting up a new EM Center to meet all RFP requirements," and "[a]ny reasonable evaluation would have resulted in significant PSU cost realism adjustments such that the ACI evaluated cost would be less than the PSU evaluated cost." *Id.* at 26–27.

Reserving for a moment a discussion on the merits, Plaintiff's assertions appear contradictory on their face given that only mere sentences before Plaintiff made these assertions, Plaintiff boasts that "ACI's Demo Factory (part of the EM Center) alone has over $▮▮▮ of electronics manufacturing and test equipment with the extensive facilities required to operate the factory *that ACI utilizes for the benefit of the Navy at no cost*." *Id.* at 26 (emphasis added). In other words, facilities and services that Plaintiff apparently provides to the government *at no additional cost* must necessarily, from Plaintiff's perspective, result "in significant . . . cost realism adjustments" if the same were provided by PSU.

Moreover, the Court notes Plaintiff's failure to cite a *single* case concerning cost realism, disparate evaluation, or any other formulation of its objection to demonstrate that the agency's price evaluation of PSU's proposal was in error. *See* Pl.'s MJAR at 26–27. It is one thing for a party to cite cases that, after review by the Court, prove distinguishable or irrelevant. It is quite another, however, to entirely omit any case law or legal standards through which the Court should view a party's assertions. The Court is not here to do Plaintiff's legal research for it.

Nonetheless, in reviewing the merits of Plaintiff's argument, the Court finds nothing unreasonable about the Navy's cost realism analysis (or overall price evaluation) of PSU's proposal. Here, "the court looks at whether the agency's price realism analysis was consistent with the requirements of the RFP." *KWR Constr., Inc. v. United States*, 124 Fed. Cl. 345, 357

(2015).  "The FAR does not mandate any particular method of proceeding, and 'the nature and extent of a price realism analysis, as well as an assessment of potential risk associated with a proposed price, are generally within the sound exercise of the agency's discretion.'"  *Afghan Am. Army Servs. Corp.*, 90 Fed. Cl. at 357 (quoting *Pemco Aeroplex, Inc.*, B–310372.3, 2008 CPD ¶ 126, 2008 WL 2684841, at *5 (Comp. Gen. June 13, 2008)).  Likewise, the Federal Circuit has compelled this Court to determine "whether the agency's price-realism analysis was consistent with the evaluation criteria set forth in the RFP . . . not to introduce new requirements outside the scope of the RFP."  *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375–76 (Fed. Cir. 2009) (citation omitted).

Here, the solicitation instructed the agency to conduct a cost realism analysis as well as assess cost reasonableness.  As to cost realism, it provides that the Factor 8 evaluation would review:

> 1.  Realism of the proposed costs – Cost Realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements:
> - realistic for the work to be performed,
> - reflect a clear understanding of the requirements, and
> - are consistent with the various elements of the offeror's technical proposal.

AR 396.

Even a cursory review of the agency's price evaluation/cost realism analysis—and addendum, *see* AR 1787–1851—demonstrate a thorough and reasoned consideration by the Navy of PSU's proposed costs for various task orders and the government's probable cost for each.  *See generally* AR 1304–1329; *see also* AR 1329 (CO/SSA concluding after analysis that "[PSU's] proposed price (cost plus fixed fee) is realistic for the work to be performed, reflects their understanding of the requirements, and is consistent with elements from the offeror's technical proposal"); AR 1788 ("It was the determination of the Contracting Officer to seek out the most recent rate information due to the length of time the proposals have been in evaluation (proposals were submitted NLT 24 June 2020 and have been in analysis approximately 13 months)[.] This determination is necessary to ascertain if the Government was unknowingly placing itself at a cost risk.").  It is rather telling, in fact, that in challenging the Navy's cost realism analysis of PSU's proposal, Plaintiff fails to cite to even a single page of the agency's nearly thirty-page long evaluation at PSU's pricing structure.

Additionally, while Plaintiff baldly insists that an award to PSU would entail "substantial additional costs associated with PSU starting up a new EM Center to meet all RFP requirements," Pl.'s MJAR at 26, the Navy's Final Proposal Technical Consensus Report specifically identifies as a strength that "[a]s part of Penn State University, the offeror has provided access to the greater resources of the university (e.g. ARL)," which "includes their staff expertise as well as laboratories, which include a broad range of electronics capability," AR 1769.  According to the consensus report, PSU's proposal "also includes a unique access to one of the country's large anechoic chambers.  Access to this amongst others is a strength of their offer by providing expertise and facilities to cover the RF spectrum (versus just optical portion of

the electromagnetic spectrum) which can be directly brought to bear to support the identification, prioritization, development, execution, and trouble shooting of anticipated ManTech programs and / or support (i.e. resources to support task 1 and 2)." *Id.* The Court finds nothing in the consensus report or elsewhere in the record that should have alerted the CO/SSA to potentially "substantial additional costs" in PSU's proposal when conducting its cost realism and risk analyses.

Construing Plaintiff's objections as a disparate evaluation argument instead, Plaintiff fairs no better. "To prevail on a disparate evaluation claim, a protestor must show either that the agency unreasonably evaluated aspects of its proposal that were 'substantively indistinguishable or nearly identical [to] those contained in other proposals,' . . . or that 'the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines' . . . ." *Ascendant Servs., LLC, v. United States*, No. 22-72 C, 2022 WL 2063327, at *10 (Fed. Cl. May 16, 2022) (quoting *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020)) (citation omitted). "Only if a protestor meets one of these two thresholds can the reviewing court 'comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion in these matters.'" *Id.* (quoting *Off. Design Grp.*, 951 F.3d at 1373).

Plaintiff, however, makes no such showing—and, recall, cited no case law. In fact, Plaintiff's own briefing makes crystal clear that its objection is *not* concerning aspects of the proposals that were "substantively indistinguishable." According to Plaintiff, "[t]he Navy's substitution of [Plaintiff's] PBRs was . . . arbitrary, unreasonable, and contrary to the FAR because it was disparate and unfair." Pl.'s MJAR at 26. In its very next sentence, however, Plaintiff laments that "[t]he Navy price evaluation did not consider the significant start-up costs of PSU establishing an EM Center." *Id.* One offeror's provisional billing rates versus another offeror's potential start-up costs are, self-evidently, not "substantively indistinguishable" aspects of the proposals. Yet, that is exactly what a protestor must demonstrate in order to establish a disparate evaluation claim.

In sum, whether construed as a cost realism challenge or disparate evaluation argument, Plaintiff fundamentally asks this Court to substitute its judgment for that of the agency. This Court will not do. *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1311 (Fed. Cir. 2021) ("'Contracting officers are given broad discretion in their evaluation of bids,' and when a decision within the scope of that discretion 'is reasonable[,] a court may not substitute its judgment for that of the agency.'") (quoting *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)). For all the stated reasons, Plaintiff's challenge to the agency's cost realism analysis and price evaluation of PSU's proposal falls short.

### 3. Plaintiff Has Not Established that the Navy Unreasonably Evaluated Proposals Under Technical Factors 1–3

Plaintiff next challenges the Navy's evaluation of proposals under Technical Factors 1–3, contending that PSU should not have received certain strengths and Plaintiff should not have received certain weaknesses.

a. *The Navy's technical evaluation of PSU's proposal*

According to Plaintiff, "[h]ad the Navy rationally evaluated the technical proposals, ACI's superior proposal would have been considered during the tradeoff analysis and best value determination, and ACI would have received award." Pl.'s MJAR at 27. From a merits perspective, it is telling that Plaintiff's arguments as to the *most important factors* in this solicitation, *see* AR 369, 1892, are left toward the end of its briefing. Plaintiff's objections to the Navy's technical evaluations and assigned weaknesses, however, "deal with the minutiae of the procurement process in such matters as technical ratings . . . which involve discretionary determinations of procurement officials that a court will not second guess," *E.W. Bliss Co.*, 77 F.3d at 449, and Plaintiff fails to establish—or even clearly argue—that the agency committed prejudicial error in any of the challenged technical evaluations.

Plaintiff first objects that "PSU received a 'Good' rating under Factor 1 (Operations and Management) – the same rating as ACI – even though PSU lacked electronics manufacturing capabilities and experience." Pl.'s MJAR at 28 (citing AR 1768–71). Plaintiff contends that, based on the evaluation criteria and solicitation requirements, PSU should have received a significant weakness or deficiency, as its "proposal failed to show the relevant expertise in electronics manufacturing or capabilities – the Center's primary mission . . . ." *Id.* Plaintiff cites in support Section M, 2 of the solicitation, which provides that

> [t]he Government will evaluate the following pertaining to the Understanding of
> the Requirement:
>
> . . .
>
> 2. The Offeror's capabilities to accomplish the task requirements through
> relevant knowledge of ManTech Center specific technologies and their transition
> from development stages into industrial applications, manufacturing of Navy or
> DoD weapon systems, and/or implementation into the U.S. Center specific
> industrial base . . . .

AR 391.

Plaintiff focuses on the fact that in the *initial* Technical Consensus Report, PSU received a significant weakness under Factor 1[10] for "fail[ing] to mention much if any expertise with

---

[10] There is some ambiguity in the record as to how many "significant weaknesses" PSU was actually assigned. In the initial Technical Consensus Report analysis of PSU under Factor 1, there is only one primary bullet point describing "*a* significant weakness . . . ." AR 1228 (emphasis added). The next mention of "a significant weakness" appears only in a sub-bullet point of the single primary bullet. *Id.* Furthermore, in the overall summary for PSU, the initial report mentions "*a* significant unmitigated weakness"—not multiple. AR 1229 (emphasis added). By the time of the final Technical Consensus Report, following FPRs, a heading in PSU's Factor 1 analysis states that "[t]he offeror *initially received 2* significant weaknesses in this area," AR 1770 (emphasis added), but by the overall summary, the very same report speaks only that "the significance of *the* weakness in the initial version of their proposal was mitigated by the description provided in the revised proposal submitted at the invitation of the contracting

26

embedded systems related manufacturing technology or approaches (i.e. cards in chassis or cabinets to build systems which are the trade names for 'Electronics manufacturing technology (materials, devices, circuits, modules, subsystems)')," which "is considered a significant weakness considering that the focus areas of this center is electronics manufacturing . . . ." AR 1228. PSU's overall adjectival rating for Factor 1 in the initial Technical Consensus Report was "Acceptable." AR 1229. After receiving PSU's FPR, however, the Navy upwardly adjusted PSU's overall rating for Factor 1 to "Good," noting in the final Technical Consensus Report that "the significance of the weakness in the initial version of [PSU's] proposal was mitigated by the description provided in the revised proposal submitted at the invitation of the contracting officer." AR 1771; *see also* AR 1667 (PSU's FPR providing that "[w]e have considerable expertise in electronics and electronics manufacturing a) within the ARL EO Division, b) directly accessible expertise within the ARL, c) within Penn State academic departments, and d) within outside organizations such as government laboratories and industry.").

While Plaintiff disputes the reasonableness of this change in rating, the Court finds no articulated basis to "second guess" the Navy's technical determination. *E.W. Bliss Co.*, 77 F.3d at 449. Rather, as the government correctly notes, "ACI offers only its disagreement with the agency's conclusion." Gov.'s Cross-MJAR at 18.

Plaintiff also challenges the Navy's evaluation of PSU under Factors 2 and 3. However, as the government correctly observes, "ACI appears to have abandoned its . . . challenges to the Navy's evaluation of PSU's proposal under Factors 2 and 3, saying nothing in its reply brief about those factors at all." ECF No. 32 ("Gov.'s Reply") at 12 (citing ECF No. 28 at 31–33); *see Newimar S.A. v. United States*, No. 21-CV-1897, 2022 WL 1592813, at *14 (Fed. Cl. May 12, 2022) ("A party is not permitted 'to raise a phalanx of thin arguments in a dispositive motion — thereby forcing the opposing party to spend time and briefing space to engage with all of them — only to abandon them in the face of the counterarguments, and yet insist that the Court adjudicate the entire initial salvo.'") (quoting *Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 695 (Fed. Cl. 2022)); *see also Cap Export, LLC v. Zinus, Inc.*, 722 F. App'x 1004, 1009 (Fed. Cir. 2018) (suggesting that appellant "may have abandoned the reference altogether, as [it] did not address that reference in its opposition brief before the district court"); *Voith Hydro, Inc. v. United States*, 143 Fed. Cl. 201, 218 (2019) (holding that a plaintiff's failure to reply to a defendant's response to an argument in the plaintiff's opening brief "evince[ed] an abandonment of this protest ground").

To any extent that Plaintiff's challenges to the Navy's evaluation of Factors 2 and 3 are not waived, the Court briefly addresses Plaintiff's Factor 2 and 3 arguments as follows. As to Factor 2, Project Development and Management, Plaintiff alleges that "the Navy ignored PSU's lack of specific electronics manufacturing experience and capabilities, contrary to RFP requirements, and unreasonably failed to identify any weaknesses or deficiencies." Pl.'s MJAR at 29–30. Referencing the solicitation's criteria for project development, Plaintiff contends that

---

officer," AR 1771 (emphasis added). This matter may be purely academic, but the Court notes it only to demonstrate that—from a mere counting perspective—PSU may have originally had even *fewer* weaknesses to offset or improve upon, and thus a change in overall rating from "Acceptable" to "Good" by the Technical Review Team appears even more reasonable.

"[i]t is unreasonable to conclude that PSU would be able to identify and prioritize center specific technologies when PSU lacked the necessary experience or personnel to do so." *Id.* at 30. Similarly, Plaintiff's challenge under Factor 3, Key Personnel and Staffing, contends that "PSU should have received a lower rating than 'Acceptable' given its lack of personnel with relevant and required experience." *Id.*

Yet again, as with Plaintiff's arguments regarding Factor 1, the Court finds nothing in Plaintiff's contentions regarding the Navy's evaluation of PSU under Factors 2 and 3 that establishes *prejudicial* error within the technical evaluations. For one, Plaintiff already received an "Outstanding" rating under Factor 3, which was taken into account by the SSA in its award determination. *See* AR 1921 (Source Selection Decision noting that "[t]he PSU proposed approach in Factor 2 outweighs the ACI approach."). Plaintiff's unsupported assertion that PSU simply "should have resulted in a lower rating" under Factors 2 and 3 makes no attempt to say what *specifically* PSU should have received under the terms of the solicitation and *how* that change would have affected the overall rating. Pl.'s MJAR at 31. Moreover, Plaintiff acknowledges that the Navy considered the relevant factors in evaluating Factors 2 and 3 but simply disagrees with the Navy's conclusions. This fails in any way to establish that the Navy's evaluation was unreasonable. Plaintiff's mere disagreements with the Navy's evaluation, without more, "no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious." *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003). Furthermore, as explained further below, Plaintiff fails to properly allege prejudice—seemingly preferring that the Court simply find it for Plaintiff.

> *b. The Navy's technical evaluation of Plaintiff's proposal*

Plaintiff next challenges the Navy's assignment of weaknesses to its own proposal under Factors 1 and 2. As to Factor 1, COE Operations and Management, Plaintiff alleges that "the Navy assigned ACI a 'Good' rating with 8 strengths and 3 weaknesses," but "[t]he three weaknesses are contrary to ACI's FPR and are otherwise unreasonable for offering evaluation explanations that run contrary to the evidence before the agency." Pl.'s MJAR at 31 (citation omitted). As to its weaknesses under Factor 2, Project Development and Management, Plaintiff contends that "[t]he two weaknesses are contrary to the ACI FPR and are otherwise unreasonable." *Id.* at 33. Plaintiff articulates numerous grounds on which it disagrees with the agency's technical evaluations of Factors 1 and 2, but the Court reads these as just that—disagreements.

First, the Court looks at Plaintiff's three Factor 1 weaknesses assigned in the initial Technical Consensus Report:

Weaknesses –

   -   All reviewers expressed concerns in different ways regarding the organizational structure and the proposed approach to operation of the center. Specifically, failure to have the Center Director to have overarching responsibility over the Center of Excellence creates risk that they will not have access to or control of the organization's

resources critical and / or necessary to fulfill their center operation tasking (e.g. Naval Technical Advisor, outreach, performance monitoring and management) outlined in the statement of work. The future risk can be mitigated by added government oversight to enforce the requirements of the SOW (i.e. adding cost to the government, taking away resources which otherwise could be put towards projects). This risk is considered acceptable in return for the greater productivity of the current team based on the recent (i.e. last 5 years) successful change of the Center Director, the most important Key Personnel.

o   There were multiple concerns that the Center Director is not at the top of the hierarchical structure for the proposed center. On the one hand, the Center Director should have overarching responsibility for the Center (i.e. at the top of the org chart in Figure 2 on page 11) which they are not. On the other hand, Figure 2 shows the organization structure, roles and reporting lines with the Business Director and the Center Director reporting to the company's president. As drawn, the Center Director does not have authority or responsibility over the business operations of the Center, which consequently creates a risk regarding gaining access to and setting the priorities of a critical center resource. This risk is mitigated to some extent when the offeror states (page 11) that all positions are accountable to the Director on all programmatic and technical issues and (page 10) that staff will be made "available 100% of the time."

o   The labor mix between task order 1 and 2 appeared to fail to propose use of the lowest level staff necessary to perform these tasks (i.e. potentially adding additional, unnecessary cost). There was a higher number of hours allocated for Lead/Senior engineer than expected to task order 1 and a lower number of hours for admin (financial professional?) to support project rate and costing negotiations during project development and execution, and outreach. This adds costs that otherwise could be put towards Task 1 or 2 or project work.

o   In the event of changing team members, who is responsible to whom in order to be able to address problems is not clearly articulated in the organization chart or description (i.e. a flaw in the proposal that creates risk). Specifically, in the event that a project runs into problems, it is unclear who is looking over

29

whose project in what order to react to the problem. This is viewed as a significant enough risk to be considered a weakness unless roles, responsibilities and reporting hierarchy can be clarified.

- The offeror makes limited comment on their abilities relative to parts obsolescence and support for detecting and testing counterfeit parts. The SOW specifically references this need, which has increasing importance (i.e. potentially needing ManTech support). While the offeror omitted any statement of their means to fulfill this requirement, they did reference their relevant abilities (i.e. page 3) and listed test capabilities (page 48 and 49) which are exactly the tools needed to fulfill the requirement thus effectively providing the means to mitigate the risk.

- The fact that all of the examples described in the proposal were more costly and longer term than those described in the solicitation and SOW (e.g. short – 6 month / low cost – ≤$100k) fails to fulfill the spirit and intent of special projects potentially creating additional cost to the Navy to have to proscriptively establish a special project when and if needed. While this can be addressed at added cost, it does raise a concern that the Offeror does not seem to understand and / or appear to be able to respond effectively to a need for a low cost quick reaction project, but instead jumps to more expensive alternatives.

AR 1225–26.  The Court notes that the first weakness assigned under Factor 1 had, itself, what appear as three sub-weaknesses or justifications for the overall weakness.  The record also demonstrates that the Navy informed Plaintiff of all weaknesses during discussions—and Plaintiff does not dispute that it was so informed.  *See* AR 1337 ("Agenda for ONR EMC Discussions" showing that "Technical Evaluation" is "needed for discussions").

Yet, in its FPR Matrix, which "represents changes made by the offeror from the initial proposal submission to the final proposal revision," Plaintiff addresses *only* the Navy's "concern over the EMC Director having overarching responsibility over the COE and a concern over changing team members in the event of departures."  AR 1482.  The Court does not follow, then, Plaintiff's contention that "[t]he *three weaknesses* are contrary to ACI's *FPR*," when Plaintiff in its own FPR Matrix addresses at best only two of the three sub-weaknesses of its first Factor 1 weakness. Pl.'s MJAR at 31 (emphasis added).  In other words, Plaintiff's FPR Matrix makes no mention whatsoever of an attempt to address the third sub-weakness of the first weakness— "[t]he labor mix between task order 1 and 2 appeared to fail to propose use of the lowest level staff necessary to perform these tasks (i.e. potentially adding additional, unnecessary cost)"—nor does it acknowledge at all or attempt to explain away the other two weaknesses concerning "abilities relative to parts obsolescence" and "[t]he fact that all of the examples described in the proposal were more costly and longer term than those described in the solicitation and SOW."[11]

---

[11] As to Plaintiff's third Factor 1 weakness concerning "[t]he fact that all of the examples described in the proposal were more costly and longer term than those described in the solicitation and SOW," AR 1226, Plaintiff contends that it was unreasonably assigned as "ACI provided two

AR 1225–26. On these facts *alone*, the Court finds no basis to hold unreasonable the agency's assignment of three weaknesses under Factor 1 in the final Technical Consensus Report. *See* AR 1767; *see also* Gov.'s Reply at 12 ("Other remaining weaknesses led to ACI's overall 'good' rating, however, all of which ACI was advised of during discussions but which ACI concedes that it chose to ignore.").

Plaintiff failed to address, at minimum, two of its three weaknesses and now proceeds here by asking the Court to second guess the very "minutiae of the procurement process in such matters as technical ratings . . . ." *E.W. Bliss Co.*, 77 F.3d at 449. This, the Court will not do. Rather, "[a]n offeror has the responsibility to submit a well-written proposal with adequately detailed information that allows for a meaningful review by the procuring agency." *KSC Boss All., LLC v. United States*, 142 Fed. Cl. 368, 382 (2019) (quoting *Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture*, 89 Fed. Cl. at 744). If Plaintiff's FPR failed to demonstrate a thorough understanding of the requirements of this procurement, Plaintiff has only itself to blame. *Wis. Physicians Serv. Ins. Corp. v. United States*, 151 Fed. Cl. 22, 35 (2020) ("[T]he TEP and the CO were under no obligation to discern what [the plaintiff] 'intended to communicate,' because it was [the plaintiff's] obligation to 'adequately address this important requirement.'" (quoting *KSC Boss All., LLC*, 142 Fed. Cl. at 382)). Plaintiff seeks to have the Court find that it should have received an "Outstanding" rating on these factors. However, in order to receive an "Outstanding" rating, Plaintiff would have needed not only to demonstrate an exceptional approach, but an exceptional *understanding* of the solicitation's requirements as well. AR 390 (describing Technical Factors ratings, for which an "Outstanding" rating requires a proposal to "indicate[] an *exceptional* approach *and understanding* of the requirements") (emphasis added). Thus, even if Plaintiff were correct regarding its technical approach, its inability to convey that approach to the evaluators—even after they assigned it a weakness and gave Plaintiff the opportunity to address it—seems to demonstrate per se that it did not have an exceptional understanding of the requirements.

For the same reasons, Plaintiff fairs no better in challenging the agency's assignment of weaknesses under Factor 2, Project Development and Management. Plaintiff's two Factor 2 weaknesses assigned in the initial Technical Consensus Report are as follows:

Weaknesses –

-       There were a few miscellaneous issues identified by the review team which cumulatively add up to a weakness due to the cost to the government to mitigate (although it could have easily been addressed upfront in the proposal). The time horizon for Navy ManTech programs tend to be shorter than the 5-7 years identified in the offeror's proposal (versus 36 months for a Standard ManTech Project per SOW paragraph 3.0). The offeror failed to focus their prioritization on manufacturing readiness (e.g. MRL referenced in SOW paragraph 3.1.2 not to mention the definition of ManTech derived from Title 10) versus the typical focus S&T has on technical

---

representative efforts in its proposal meeting solicitation requirements," Pl.'s MJAR at 32. Yet, a simple review of Plaintiff's proposal demonstrates that its "two representative efforts" say nothing at all of cost or time, nor addressing the agency's concerns that were raised in discussions. *See* AR 439.

readiness (e.g. TRL) which was mentioned. This could lead to wasted effort in project selection and development. Also the lack of involvement by the business manager (i.e. no hours allocated in the labor mix) creates a potential gap in focus which could lead to failure during project selection, development, and execution again by wasting effort which could have been avoided with their oversight.

- A critical element of the offeror's proposal is the development of and reliance on their technology investment road map (i.e. described on page 5 of their proposal). While this could have been integrated into the proposal to create a logical way to fulfill the SOW requirement, the proposal does not mention sharing this with the government. Consequently, a gap is created in their ability to demonstrate that they have fulfilled the project development requirement (per SOW task 3.1, e.g. project identification and selection).

AR 1230–31 (Technical Consensus Report). Yet, similar to its argument regarding its Factor 1 weaknesses, Plaintiff appears to have only attempted to address one of two Factor 2 weaknesses—and seemingly only a sub-factor of that one weakness, at that. Plaintiff's FPR Matrix addresses the Navy's "[c]oncern over the perceived lack of involvement by the business manager during the project planning and development stage due to no hours allocated in the labor mix." AR 1483. Only now, post-award, does Plaintiff take issue with the agency's assignment of a second weakness concerning Plaintiff's failure to articulate a technology investment roadmap. *See* Pl.'s MJAR at 33–34. But Plaintiff's opportunity to confront that weakness head-on has long passed, and Plaintiff provides no basis for the Court to now overrule the Navy's discretionary judgment on such a highly technical matter.

Fundamentally, each of Plaintiff's technical evaluation objections reflects its own disagreement with the judgment of the agency. Absent more, the Court cannot second guess the agency's determinations. Additionally, and most importantly, Plaintiff fails across the board to make a coherent prejudice argument as to the agency's evaluation of Factors 1–3, whether of PSU's proposal or its own. It is not enough for Plaintiff to claim that "[h]ad the Navy rationally evaluated the technical proposals, ACI's superior proposal would have been considered during the tradeoff analysis and best value determination, and ACI would have received award." Pl.'s MJAR at 27. Unless, of course, Plaintiff believes it needed to succeed on *every* alleged error in the agency's evaluations of the two proposals under Factors 1–3—which the Court has already found is not established by the record.

Rather, Plaintiff must give *some* direction to the Court on where it views the line of competitive prejudice. For example, had Plaintiff succeeded *only* on its Factor 1 argument concerning PSU, would that be enough to demonstrate competitive prejudice? Would PSU have received a lower overall rating under Factor 1, and thus Plaintiff stood a substantial chance of award, and if so, why? Or, had Plaintiff reversed one, two, or three of its own assessed weaknesses under Factor 1, would that alone be enough to demonstrate competitive prejudice?

Would Plaintiff have received a higher than "Good" overall rating under Factor 1, and if so, why?  Based on Plaintiff's briefing, the Court is left to wonder.

It cannot be that the state of prejudice law in this Court is so amorphous that a plaintiff simply may allege—or even *establish*—that an agency unreasonably assigned a few strengths and weaknesses in its technical evaluations *and therefore* the plaintiff was prejudiced.  After all, an agency may indeed err in a procurement, but that error may effectively be harmless against an offeror.  *See Ascendant Servs., LLC*, No. 22-72 C, 2022 WL 2063327, at *8 ("On the merits of a bid protest, it is not enough to show that an agency has stepped out of bounds; rather, *a protestor must further show* that the offending agency's conduct prejudiced it.") (citing *CW Gov't Travel*, 154 Fed. Cl. at 736) (emphasis added).  Stated differently, "[t]here is no presumption of prejudicial error, even in cases where the agency's action was irrational."  *Id.* (citing *Sys. Studies & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021)).

At oral argument, the Court pressed this matter with counsel for Plaintiff, and the exchange proved enlightening:

> THE COURT:  I asked you and you clearly articulated to me that past performance, if it was changed, you think [Plaintiff was] prejudiced.  What you're not clearly articulating to me . . . with these technical factors, is what I'm supposed to do with them.  If I disagree with you on cost and past performance, and I flip all the technical factors . . . [w]as ACI prejudiced? . . .

> COUNSEL:  Yes, we think we were because --

> THE COURT:  What if I flip two of them?  You see, . . . you don't have an argument for why it changes anything.  You just say they're arbitrary and capricious.  I don't think you have an argument for why the arbitrary and capriciousness in the technical factors changes anything. . . .

> So you could have come here and argued, well, we know we could [not] have gotten an outstanding because we had weaknesses.  If you remove the weaknesses, we had a chance of getting outstanding.  That's me articulating that.  That's not you articulating that. . . .

> I just don't know, quite frankly, what to do with these weaknesses, if I agree with all of them, if I agree with some of them.  You're just like, okay, it's a weakness, if you flip it, you've got to send it back.  Why?

> COUNSEL:  Well, to what you just said, we had a substantial chance of receiving the outstanding rating which we take into account when the agency makes the award decision.

> THE COURT:  That's my argument.  I just made that argument.  I'm saying that the – that's the gold standard obviously is to get rid of all the weaknesses.  I'm saying you didn't make that argument, I just made that argument from my

observation of the administrative record.  So if I don't find all three weaknesses . . . were arbitrary and capricious, you weren't prejudiced?

COUNSEL:  Again, we disagree with that, because –

THE COURT:  I just think it's your burden and you're not meeting your burden on prejudice here. . . .  Anything less than me flipping all the weaknesses, I don't take you having an argument for prejudice.

COUNSEL:  Okay. You know, we're happy to address that in any follow-up briefing the Court can request that we can do on an expedited basis.

ECF No. 34 at 127–29.  Suffice it to say, counsel's response was insufficient—supplemental briefing is not the place to address for the first time a necessary element of the merits of a bid protest.  Thus, short of succeeding on all of its technical factor challenges—which Plaintiff has not done—Plaintiff has not established (or, more correctly, even offered an argument to attempt to establish) prejudicial error, nor articulated what specifically *would* be prejudicial error, by the agency in its respective evaluations of Plaintiff's and PSU's proposals.  For all of these reasons, Plaintiff's arguments as to the Navy's technical evaluations fall short.

### 4.  Plaintiff Has Not Established that the Navy Erred in Its Tradeoff Analysis and Best Value Determination

Finally, the Court briefly addresses Plaintiff's objections to the Navy's tradeoff analysis and resulting source selection decision.  Plaintiff argues that the Navy's source selection decision was irrational.  *See generally* Pl.'s MJAR at 34–37.  Specifically, according to Plaintiff, "[t]he Navy tradeoff and best value determinations were arbitrary because they relied on the flawed evaluations discussed above."  *Id.* at 34 (citing AR 1918–21); *see also id.* at 36 ("But for the flawed cost evaluation, PSU would have had a small cost advantage or no cost advantage.").  The government counters that "ACI disagrees with the SSA's judgment and decision making, but fails to demonstrate her evaluation was arbitrary or irrational."  Gov.'s Cross-MJAR at 18; *see also id.* at 19 ("[As to Factors 2 and 3,] ACI acknowledges that the Navy considered the relevant factors but disagrees with its conclusions, while failing to establish that the Navy's evaluation was in any way arbitrary or irrational.").

The government's argument is the better of the two.  While the FAR indeed demands a comparative assessment of proposals against the source selection criteria, *see* FAR 15.308, there is nothing in the record indicating the SSA failed to do anything but that.  On top of that, "[a]n agency's contract award is [] *least* vulnerable to challenge when based upon a best value determination."  *PlanetSpace Inc. v. United States*, 96 Fed. Cl. 119, 125 (2010) (citing *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004)) (emphasis added).  In other words, "this Court is to provide [] deference to the Agency's best value tradeoff."  *Sirius Fed., LLC v. United States*, 153 Fed. Cl. 410, 423 (2021) (citing *Med. Dev. Int'l, Inc. v. United States*, 89 Fed. Cl. 691, 702 (2009)); *see also E.W. Bliss Co.,* 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.").

Moreover, "[i]t is well settled that the government is only required to make a 'cost/technical tradeoff . . . where one proposal is rated higher technically than another, but the other is lower in cost.'" *Sirius Fed., LLC*, 153 Fed. Cl. at 424 (quoting *Indus. Prop. Mgmt., Inc. v. United States*, 59 Fed. Cl. 318, 324 (2004) (other citations omitted). Yet here, Plaintiff challenges the adequacy of the Navy's tradeoff analysis between its proposal and PSU's proposal, which had a higher technical rating *and* lower price. In relevant part, the SSA concluded—

> The PSU proposed approach in Factor 2 outweighs the ACI approach. The ACI approach in Factor 3 outweighs the PSU approach; however, Factor 2 is more heavily weighted than Factor 3 *which gives PSU the technical advantage*. . . . I am unable to reasonably determine that ACI's Key Personnel (Factor 3) alone are worth a 19% premium to the Government, when the proposed PSU technical approach is exceptional and includes strong technical personnel, poses a very low risk to the Government for Past Performance, and is the lowest priced offeror.

AR 1921 (emphasis added). In sum, and under these facts, Plaintiff's tradeoff analysis and source selection contentions have no merit.

Furthermore, as detailed throughout this opinion, the Court finds no prejudicial error in the Navy's underlying evaluations. The SSA's tradeoff analysis and resulting source selection decision was reasonable, and Plaintiff has made no compelling argument to the contrary.

### 5. Plaintiff Is Not Entitled to Injunctive Relief

Because Plaintiff has not shown that the Navy's evaluation of proposals was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, the Court only briefly turns to Plaintiff's request for injunctive relief. The Federal Circuit has articulated the test for a permanent injunction as follows:

> To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief.

*Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)). "'[P]roving success on the merits is a necessary element for a permanent injunction,' but '[w]e may balance the remaining three *Centech* permanent injunction factors — irreparable harm, balance of hardships, and public interest — when deciding whether to grant or deny injunctive relief[.]'" *Seventh Dimension, LLC v. United States*, No. 21-2275C, 2022 WL 1486504, at *25 (Fed. Cl. May 4, 2022) (quoting *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 & n.13 (Fed. Cir. 2018)). As Plaintiff has not succeeded on the merits of its case, no further balancing is necessary. Plaintiff is not entitled to injunctive relief.

**C.**      **Conclusion**

For the reasons set forth above and in the Court's order of June 10, 2022, Plaintiff's motion for judgment on the administrative record and for a permanent injunction is **DENIED**. The government's cross-motion for judgment on the administrative record is **GRANTED**. The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED**.

s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge